CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

3/31/2025

LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
      DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

KELLY BUCK,

*Plaintiff*,

v.

MODINE MANUFACTURING
COMPANY,

*Defendant.*

CASE NO. 6:23-cv-00039

<u>MEMORANDUM OPINION</u>

JUDGE NORMAN K. MOON

Plaintiff Kelly Buck ("Buck") filed a six-count complaint against her former employer, Defendant Modine Manufacturing Company ("Modine"), alleging discrimination and retaliation in violation of (i) Title VII of the Civil Rights Act of 1964 (Counts I and II), (ii) the Virginia Human Rights Act (Counts III, IV, and V), and (iii) Virginia common law (Count VI, *Bowman* Claim). Dkt. 1. Buck generally alleges that a co-worker's tendency to "mansplain" to her was discriminatory, and that Modine discharged her in retaliation for complaining about the co-worker's behavior. The Court previously dismissed Buck's common law *Bowman* claim (Count VI) for failure to state a claim. *See* Dkt. 17. Modine now moves for summary judgment on the five remaining counts. *See* Dkt. 20 (motion for summary judgment).

For the reasons set forth below, the Court concludes that no reasonable jury could find that Modine discriminated against Buck on the basis of her sex or retaliated against her for opposing such alleged discrimination. Instead, the record shows that Buck demonstrated "multiple behavioral issues," such as the use of profanity and sarcasm, disdain for upper management decisions, lack of humility, and poor conflict resolution skills. *See*, *e.g*., Dkt. 21-11. Due to these issues, Buck was deemed unfit and discharged. That is not sex discrimination or

1

retaliation. The Court will therefore **GRANT** Defendant's motion for summary judgment on all counts in an accompanying order.

## I.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). Once a party makes a Rule 56 motion, "[t]he burden is on the nonmoving party to show that there is a genuine issue of material fact for trial … by offering sufficient proof in the form of admissible evidence." *Id.* (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)) (internal quotation marks omitted). The plaintiff may not rest on allegations in the pleadings; rather, she must present sufficient evidence such that a reasonable fact finder could find for her by a preponderance of the evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Id.* "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

## II.    Factual Background

The following facts are either uncontested or viewed in the light most favorable to Buck as the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

### A.  Buck Begins Work in the Field of Human Resources

Plaintiff Kelly Buck graduated from the United States Military Academy in 2012 and served in the United States Army for about four years, from March 2013 to May 2017. Dkt. 25 (Buck Dep.) at 14:4-10. During her service, she performed primarily administrative functions. *Id*. at 11:3-22; 14:5-10; 15:1-6. When she left the Army in May 2017, she began work as a Human Resources ("HR") generalist for Saint-Gobain, a building materials company. *Id.* at 15:11-20. In this role, Buck assisted with tasks such as hiring, conflict resolution, administrative duties, and complaint investigations. *Id.* at 16:4-22. However, in or around March 2019, she was laid off from Saint-Gobain due to a reduction in workforce. *Id*. at 18:1-2.

Following Saint-Gobain, Buck was hired as an HR supervisor for NVR, a residential home building company. She initially oversaw recruiting, hiring, promotion, and other HR functions. *Id*. at 18-20. A couple of years later in 2021, after a period of shadowing, she transitioned to become the shop manager at NVR, which entailed "running part of the panel department" and other smaller departments. *Id*. at 23-24. During this time, Buck also received an MBA from Mount St. Mary's University in 2021. *Id*. at 15:11-20. But not long after becoming shop manager at NVR, Buck became concerned about possibilities for advancement at NVR, and she began to seek external opportunities.

### B.  Buck Obtains Employment at Modine

Buck first learned of Modine through a headhunter. Dkt. 25 at 25:13-15. Modine, which manufactures heat transfer equipment, *see* Dkt. 21-5 (Penney Dep.) at 8, was seeking to hire a Plant Superintendent at its facility in Buena Vista, Virginia, and Buck understood that the role

would consist of managing the "production output" of roughly 250 employees working on the plant floor. Dkt. 25 at 27:1-7. Buck applied for the position, and she was interviewed by a team of Modine's management personnel, including: (1) Matt Neibur (Plant Manager), (2) Doug Penney (Engineering Manager), (3) Alison Garletts (Quality Manager), and (4) Brent Secrist (*newly* Human Resources Manager; *previously*, Plant Superintendent). *Id*. at 26:3-4.

After the interview, Doug Penney, who had worked at Modine for over 30 years, sensed that Buck had "a lot of potential," and he recommended that Buck be hired. *Id*. 40:1-11; Dkt. 24-4 (Penney Dep.) 7:13-14; 24:17-19. Matt Niebur, Plant Manager, agreed. Niebur made the decision to hire Buck as Plant Superintendent. In doing so he emphasized to Buck that he "valued humility, curiosity, and excellence," above all else. Dkt. 24-1 (Neibur Dep.) at 50:15-22. Indeed, he valued humility in particular:

> [When] you come into a factory; you don't know the factory. You don't know the people. You don't know the processes. Humility is critical, just to ask questions and be curious and learn from those that are already here.

Dkt. 24-1 at 19:18-22.

Buck began work in June 2022 and reported directly to Cindy Forbes. Forbes had recently been hired as Focus Factory Manager, a newly created position. *Id*. at 37:14-20. Buck was "excited to work for [Forbes]," since she thought Forbes was "really talented." Forbes, in turn, found that Buck was similarly "very bright" and noticed she "could pick up on things very quickly," though Forbes cautioned that Buck "definitely didn't come with the skills" that might be expected for a role in manufacturing or "similar industries." Dkt. 24-2 (Forbes Dep.) at 17:22-18:1-4. "[T]he industry she was coming from and her expertise . . . were just not the same." *Id*. at 18:5-7. Whereas Buck's prior experience related primarily to HR, Buck's new role entailed technical objectives such as "safety, quality, delivery, labor efficiency, [and] continuous

improvement." Dkt. 24-1 at 15:11-12. Forbes anticipated that Buck's gap in experience would require Forbes to engage in some level of "mentoring and coaching," to try and "mitigate that frustration" and "bridge between what [Buck] was used to" and her new role. Dkt. 24-2 at 18:17-21.

But Buck hardly got a "chance to demonstrate to those metrics." The "jury was out," and remained out, as to Buck's satisfaction of her technical metrics and objectives, because "concerns with [her] behaviors" soon predominated. Dkt. 24-1 at 15:13:22.

C.  Buck's Behavior Creates Conflict at Modine

Considering that Buck, Forbes, and other managers were recent hires—some of them taking on newly created positions—and considering that Modine as a whole was "experiencing a lot of growth," the work environment was rife with change. *See* Dkt. 24-2 at 13-16. Buck's approach to this environment was to "come in, swing axes, [and] take no prisoners." *Id*. at 39:1-12. At meetings, Buck regularly behaved in a "blatantly hostile" manner which was "very evident and upfront and very direct." *Id*. at 39:14-17. To Forbes, "it was very clear that [Buck] was not happy." Instead of Buck leveraging her role as a "complement to the existing structure," she would "question in a very negative tone or would . . . demonstrate very negative portrayance [sic] instead of being the problem solver." *Id*. at 39:12-17.

To Neibur, Buck "had a tendency to speak sarcastically" and "to project that she was more of a subject-matter expert on something than she necessarily was." Dkt. 24-1 at 16:2-12. She demonstrated a "disregard for her leadership" that was very concerning. *Id*. at 40:1-4. "It was just kind of a harsh and demeaning tone she would take with folks." *Id*. at 16:2-12. And if not "harsh and demeaning [as in] aggressive toward people," her words "implied [as] much." *Id*. at 17:6-8. "That was the implication . . . . [T]hat was the perception." *Id*. at 17:13-14. All in all,

Buck was not demonstrating "leadership behavior"—to the extent that other employees "thought it was a problem" and began to express concerns to Neibur. Dkt. 24-1 at 40:21-22; 41:1-4.

Buck, meanwhile, had her own complaints. Buck's interactions with long-time engineering manager, Doug Penney, especially generated friction. *See* Dkt. 25 at 40:1-15. Buck felt like Penney used a "condescending tone" in explaining things to her, characterized by "exaggerated slowness," which Buck found "very disrespectful." Dkt. 25 at 49:5-11. For instance, on one occasion, Buck and her team were setting up a system of lockers, aligning them in a set position according to yellow lines marked on the shop floor. Penney, apparently believing "that [the lockers] should be closer" to the yellow line, "crouched down, pointed to the yellow line, and [said] 'this is the yellow line.'" *Id*. at 50:4-19. Buck felt it was "very humiliating to be spoken to that way by senior leadership at the plant." *Id*. She felt Penney implying that she was "too stupid to know where the yellow line was." *Id*. at 51:14-16.

On other occasions, Penney would shift blame between his department (engineering) and the departments that Forbes and Buck ran (operations). Penney would "imply that machines being down was [Buck's] fault," even though Penney's team was "responsible for the machines working." Dkt. 25 at 52:9-14. Buck felt that this was unfair and that Penney did not treat any of the men that way, but she also acknowledges that "the operations team . . . leadership was women." *Id*. at 55:5-10. Penney once summoned Buck to his office and he began "slowly explaining how [Buck] could better utilize [her] team to overcome these issues." *Id*. at 58:6-17. Buck had not asked for help; she felt "[i]t was a very long explanation about how operations should run," delivered by a person assigned to engineering. *Id*. She had experienced "business disagreements with people before" but had never felt "that disrespected." *Id*. at 60:13-15. Buck suggested they "end the conversation," Penney agreed, and she left his office. *Id*. at 59:1-3. Penney then raised the issue with Forbes, as Buck's supervisor, to advise her of the complaints.

6

Dkt. 25 at 105:17-22. Meanwhile, Buck was aware that Penney had worked closely with operations at the plant for years and had even mentored persons performing Buck's function. Comparatively, she "might have had a little over a year" experience in operations—plus "some" operations experience from the Army unrelated to manufacturing. Dkt. 25 59:9-12; Dkt. 24-4 at 24:20–25:1.

Buck insists she was not alone in suffering Penney's condescension, testifying that Forbes was similarly harmed. For instance, during one morning meeting, Forbes "brought up a safety concern with the heat of the ovens at the paint line," suggesting to Penney that "if we open the ovens, . . . some of the heat will disperse . . .  and [the employees] won't have to be standing next to something so hot for so long." Dkt. 25 at 61:10-17. Penney, however, "clearly disagreed." Dkt. 25 at 61:10-17. He "turned to [Forbes] and started explaining [at] like a high school/middle school level" the basics of heat conservation, *i.e.*, how "things stay hot" even after opening the oven doors. Dkt. 25 at 61–62. Buck, observing the interaction, perceived Penney's comment as patronizing, and she felt that Penney "only seemed to really direct it toward [Forbes] and [herself]"—because they were women—despite male colleagues also being present at the meeting. Dkt. 25 at 62:13-19.

In response to such incidents, Buck, generally, would tell Forbes that she "had these issues with [Penney]" and that she felt Penney was "being inappropriate." Dkt. 25 at 99:16-21. Forbes would respond, "good, if [Buck] felt that [she] needed to complain, [she] absolutely should." Dkt. 25 at 100:1-2. Buck alleges that Forbes agreed that Penney "had a problem with [them] because [they] were women." *Id.* at 100:4-6. But Forbes also testified that Penney was "insulting or rude" to women and men alike. Dkt. 24-2 at 9:16-22.

Amidst this environment, Buck was not without grievances by the time her first performance review came around.

7

D.  The 45 Day Review

Buck's 45-day review occurred on August 19, 2022, approximately one and a half months into her tenure at Modine. Niebur conducted the meeting. Buck told Niebur that "on several occasions, [Penney] was disrespectful to [her] . . . or . . . to Forbes," and that she believed "it warranted at least a discussion with [Penney] because [she] though the behavior was inappropriate" and wanted it to stop. Dkt. 25 at 97:17-22. Niebur recalls that Buck was "concerned about the way [Penney] had spoken to her on some subject," and that "he was mansplaining." Dkt. 24-1 at 20:12-22. Buck does not recall using the words discriminatory or misogynistic, but she "would have said that . . . the reason [Penney] was treating [them] poorly was because [they] were women." Dkt. 25 at 98:8-18.

Neibur listened. He told Buck that "[he] would deal with it" by having a "correcting conversation with [Penney] to make him aware of his behavior and the impact it was having on [Buck]." Dkt. 24-1 at 22:12-22. Furthermore, having worked with Penney "a long time" and "knowing the way [he] operates," Niebur interpreted Buck's complaint as a "not uncommon" form of conflict between staff members, particular to Penney's tendency to overexplain things. *Id*. at 22:1-22. Though Buck "was the first person in [his] office saying that to [him]" about Penney, Niebur insisted to Buck that Penney "overexplains stuff to **everyone** that he works with." *Id*. at 21:5-10; 22:1-5. He told Buck that Penney "goes into way too much detail on many topics, . . . . [but] that he has great intentions for this plant." *Id*. at 22:6-13. What's more, Niebur's perception of Penney was far from unique:

> [Penney] can speak to any person in a condescending way. I've heard him do that to male and female. He's definitely overexplained things to me a number of times, and . . . it can be insulting or rude. But he doesn't just say that to women. It's across the board. I think it's part of his innate personality. Dkt. 24-2 (Forbes Dep.) 9:16-22.

8

> [Penney] overcommunicates. He says way too much when he could just
> say a shorter amount to get the job done…it drives me nuts personally. . .
> I tried to explain that, from my own experience, [Penney] does that with
> everyone; it wasn't just her. It was everyone in the plant. He doesn't
> care who you are. It's just how he is. Dkt. 24-5 (Collins Dep.)
> 6:13-22, 7:21-8:3.
>
> [Penney] is an engineer…He does explain things thoroughly and
> sometimes can come across as overexplaining items, especially maybe
> if you're not…an engineer. Dkt. 24-3 (Secrist Dep.) 9:1-4.

With this in mind, Niebur felt confident he could address the issue without needing to escalate

the situation to HR; he "went to [Penney] knowing a conversation with him could correct [the]

concern." Dkt. 24-1 at 22:22–24:3-6. And, "to the best of [his] knowledge, it did."[1] *Id.*

   Niebur, however, had his own concerns with Buck to raise. While these performance

reviews are standard protocol at Modine, Niebur recalls steering the conversation in an unusual

direction: "I do recall in that 45-day review, in some amount, talking about humility. And I don't

think I would have had that conversation if I hadn't already seen some of those behaviors that

exhibited Buck thought she knew more than she really did," *i.e.*, "that she was lacking humility."

Dkt. 24-1 at 20:1-6; 19:10-17. After Buck's performance review, Neibur does not recall any

change or improvement in Buck's behavior or their relationship. Though Neibur was "hoping to

see some more behavior change on what [Buck] was doing on the shop floor, exhibiting that

humility," she and Neibur more or less went back to "working [their] daily lives in the plant" as

before. Dkt. 24-1 at 24:10-16.

   E.   The Sanding Incident

---

[1]    Penney said that he would make "every effort to not be heard as condescending in the future
because there certainly was never an intent to be condescending to [Buck] or anyone else." Dkt. 21-5 (Penney Dep.)
at 30:7-10. Niebur also discussed the issue with Forbes, for her awareness, and Forbes then advised Buck that she
was privy to the situation. Dkt. 25 at 104-105.

Roughly two months later, on October 6th, tension escalated. Forbes directed that the shop floor be sanded to prepare for an upcoming board meeting, and an employee named John Carpenter complied, beginning the sanding effort. Dkt. 25 at 109:12-13. Alison Garletts, Quality Manager, noticed that some of the employees in the vicinity were affected by the dust thrown up by the sander, so she went to Carpenter to request that the sanding halt temporarily. *See id*. at 108-109. Carpenter, in turn, went to Buck, who was not present at the scene, and Buck offered to obtain masks for the employees, because she "believed that was the issue." *Id*. at 108:13-22.

But Garletts "did not feel that was enough." *Id*. Buck cannot recall who searched out the other, but eventually she and Garletts found each other and "had a discussion where [Buck] said, essentially, 'I can't authorize it being stopped. [Forbes] is the one that told him to do this.'" Dkt. 25 at 110:3-12. Garletts, concerned about the employees' safety, left the conversation and found Forbes, who agreed to "put a stop to the sanding" for the time being. *Id*. at 109:1-4.

Buck, however, assumed that Niebur, rather than Forbes, had halted the project. Buck felt that Garletts often went to Neibur and that "he would do whatever she asked of him." Dkt. 25 at 112:17-22. In fact, Buck speculated that Niebur and Garletts had a romantic relationship outside of work because she "wasn't sure why [Garletts] was so favored." *Id.* at 148:12-15.

> The frustration for me was that I believed that [Garletts] had again gone around without having to discuss it and that the decision was made without even informing us. I had found out in a roundabout way that the decision had been made. And that had happened in the past with her. And so my frustration was that it appeared that we were being left out of the discussion again and that a decision had been made because [Garletts] had gone directly to him and he had not consulted with me or at the time I did not realize that [Forbes] had gotten involved.

*Id.* at 115:21-22-116:1-10. After the incident, Garletts was so upset by the interaction with Buck that she went home for the day. *Id.* at 114:16.

10

Niebur then approached Buck and asked why she was upset. Dkt. 25 at 113:7-20. Buck

relayed her concerns about Garletts bypassing her authority, and at that point Neibur informed

Buck that Forbes—not he—made the decision to halt the sanding operation. *Id*. In response,

Buck concedes she was "a little sarcastic during that conversation, which [Neibur] found

unprofessional." Indeed, Buck asked Neibur: "[I]f I start[] crying, . . . would [you] let me go

home as well?" Dkt. 25 at 114:12-13. Buck knew that Garletts had gotten so upset that she left

for the day, though she "didn't specifically know [Garletts] had been crying." *Id*. at 114:20-22.

Niebur described his interaction with Buck on October 6th as "terrible." Buck was

accusatory, sarcastic, passive-aggressive, and attacking. Dkt. 24-1 at 31:1-6. Niebur felt that

Buck was attacking Garletts by making assumptions about her behavior, and he in turn was

being attacked for trying to intervene. *Id*. at 31:4-10. Niebur felt "it was just very inappropriate."

*Id.* What's more, Niebur was frustrated that Buck, rather than worrying about the safety of the

employees, was more concerned with Garletts apparently "getting her way." Dkt. 24-1 at 67:16-

20. Niebur recalled abruptly ending the conversation and walking away extremely upset, which

is not something he would normally have done. *Id.* at 33:16-20.

Soon thereafter, Buck acknowledged to Forbes that her interaction with Neibur wasn't

her "best moment" and that she "hadn't handled it correctly." [2] Dkt. 25 at 132:1-5. (Buck

---

[2]     It is unclear, based on the depositions, whether Buck made these comments to Forbes on October
6th (immediately following the sanding incident), or on October 7th (after Buck's meeting with Neibur). Because
Buck refers to a follow-up meeting with Neibur, the Court finds it more reasonable to infer that the comments
occurred on October 6th, preceding the meeting with Neibur. *See* Dkt. 25 at 131-132. (Q: "Do you think that was
appropriate, the way you used sarcasm with [Neibur] in that instance?" A: "No, ma'am. I think I could have
handled that situation better." Q: "Okay. Did you have a conversation with Cindy Forbes about the way you
handled that conversation?" A: "I definitely told [Forbes] that I had had that interaction with [Neibur] and that I
knew it wasn't, I believe I said, my best moment when I was talking with her, that I hadn't handled it correctly. . . ."
Q: "Okay. Did [Forbes] have any follow-up conversations with you about that?" A: "[S]he said, I'm glad you
understand you could have handled that better in the future. And I did tell her at that point that, **if I was going to see
[Neibur] to discuss this**, I was going to bring up [Penney] again because I thought that was still an ongoing issue
and this was my chance to talk to him about it." Q: "Okay. Okay. After that meeting on October 7th, you were
terminated on October 28th, 2022, correct?" A: "Yes, ma'am.").

concedes that it is not uncommon for her to use sarcasm or profanity at work, at least in an

"average" amount. Dkt. 25 at 131:4-8; 110-111.) She further told Forbes that if she were

required to see Neibur again to discuss the incident, she would "bring up [Penney] again,"

because she felt that the issue remained unresolved. Dkt. 25 at 132:11-18.

The next day, on October 7th, Niebur held a meeting with Buck to discuss the incident.

Niebur hoped that, "out of that conversation, there would be some acceptance, some reflection,

some self-reflection, some acknowledgment." Dkt. 24-1 at 25-26. But Buck had different plans.

"[I]n the midst of walking through that issue, . . . she mentioned the concern about [Penney]

again." *Id*. Niebur remembers pausing in that conversation, "as it kind of took [them] off course

because that wasn't what the conversation was even about." *Id*. As Buck resurfaced her

complaints about Penney, Neibur listened, and eventually he asked her, "is there something new

I'm not aware of?" *Id.* at 26:14-19. Buck responded "no." *Id.* Buck recalls that Niebur told her

that her tone the prior day had been inappropriate, and she agreed. Dkt 25 118:12-14. However,

Buck countered that Garletts' tone was also problematic; according to Buck, Garletts had

become dismissive and emotional. *Id*. 118:22; 119:6-9.

In any case, Neibur's hopes for a productive, self-reflective meeting were dashed:

> There was nothing of the sort. There [were] accusations and
> finger-pointing at other people. I didn't feel like I made any
> headway with [Buck] or that she had self-reflected on how bad that
> interaction was.

Dkt*.* 24-1 at 31:20-32:7. After the meeting, Niebur concluded that Buck's behavior was "not

going to work." *Id*. at 32:8-10.

> [B]ased on what I had seen, I said, 'these are behaviors not
> appropriate for a plant superintendent. It's not the person I hired . .
> . . [W]e need to go [in] a different direction.'

*Id*. at 33:1-5.

12

On or around that same day, October 7th, Neibur concluded that Buck was unfit for her

position and needed to be terminated. *See* Dkt. 24-1 at 33-36. He contacted Modine's HR

director, Amy Neumann, to begin the process of terminating Buck, which entailed making a

recommendation to the board of directors. *See id*. at 34-35.

    F.   Buck's Termination

Following Neibur's request, Neumann prepared an internal memorandum recommending

that Buck be terminated and outlining the reasons. Dkt 21-11 ("[W]e are recommending that

[Buck] be terminated due to behavioral and performance issues that are considered significant

enough to not be repaired via coaching or performance management."). According to the

memorandum, which is dated October 20, 2022, Buck had demonstrated "multiple behavioral

issues" such as use of profanity and sarcasm, disdain for upper management decisions, lack of

humility, use of antagonistic tone, poor conflict resolution skills, and verbal violence. Dkt. 21-

11. The memorandum also detailed several performance deficiencies, but Niebur removed the

performance details before issuing the formal termination because the ultimate reason for the

termination was behavioral: character and behavioral issues that were not appropriate for the

leader of the shop floor. Dkt. 24-1 at 55:10-19, 56:2-4; 69:7-10.

Buck was terminated on October 28, 2022. Dkt. 25 132:19-22. After being notified of the

decision in a meeting with Neibur, Buck asked why she was being fired, and Neibur responded,

"because of the behavioral issues" which they had discussed. He refrained from discussing the

matter further. Dkt. 25 at 140:15-22.

    G.   Legal Proceedings

On or about December 23, 2022, Buck filed a Charge of Discrimination with the Equal

Employment Opportunity Commission ("EEOC") alleging sex discrimination and retaliation.

Dkt. 1 ¶¶12-15. She filed the instant action after the EEOC issued a right to sue letter. *Id*. After a

pre-trial motion to dismiss, the Court dismissed Count VI, a *Bowman* claim brought pursuant to

Virginia common law, in part because Buck did not oppose or otherwise respond to Modine's

motion to dismiss. Dkt. 17.

### III.    Discussion

Buck now maintains five causes of action against Modine, arising under Title VII of the

Civil Rights Act of 1964 (Counts I and II) and the Virginia Human Rights Act ("VHRA")

(Counts III, IV, and V). The Court concludes that each of Buck's claims must be dismissed at

summary judgment because, on the record thus presented and viewed in the light most favorable

to Buck, no reasonable jury could find that a genuine dispute of material fact exists to create a

jury issue in this matter. On the facts thus construed, Modine did not discriminate or retaliate,

and it is therefore entitled to judgment a matter of law.

### A.    Buck's Discrimination Claims (Counts I and III)

Title VII prohibits employment discrimination based on "race, color, religion, sex, or

national origin." 42 U.S.C. § 2000e–2(a). Similarly, VHRA prohibits employers from

discriminating against individuals based on "race, color, religion, [and] sex." Va. Code Ann. §

2.2-3905(B)(1). The Court analyzes Buck's sex discrimination claims under Title VII and the

VHRA together because the two claims rest on the same allegations and the statutes "use

substantially similar language" to prohibit discrimination. *Washington v. Offender Aid &*

*Restoration of Charlottesville-Albemarle, Inc.*, 677 F. Supp. 3d 383, 394 n.4 (W.D. Va. 2023).

To establish a prima facie case of disparate treatment discrimination under each statute, a

plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3)

adverse employment action; and (4) different treatment from similarly situated employees

outside the protected class. *Cosby v. S.C. Prob., Parole Pardon Servs.,* 93 F.4th 707, 714 (4th

Cir. 2024). Here, Buck is a member of a protected class, but because she cannot demonstrate that

14

she suffered an adverse employment action, nor that she was treated differently than similarly situated male colleagues, she fails to state a prima facie case of discrimination.

### 1.  *Adverse Employment Action*

To meet the burden of showing an adverse employment action, a plaintiff must show that the alleged discrimination "adversely affect[ed] the terms, conditions or benefits of employment*." Perkins v. Intl. Paper Co*., 936 F.3d 196, 207 (4th Cir. 2019). Termination is the typical adverse employment action, although actions short of termination such as a decrease in compensation, job title, level of responsibility, or opportunity for promotion may constitute adverse employment actions. *See Holland v. Washington Homes, Inc*., 487 F.3d 208, 219 (4th Cir. 2007). But, at bottom, a plaintiff must articulate how the defendant's action impaired the "terms, conditions, or benefits" of her employment. *See, e.g., Perkins* 936 F.3d at 207 (finding a Black male plaintiff had "not offered evidence" as to how employer's failure to give him performance reviews altered the terms or conditions of his employment).

Here, Buck has not alleged that she suffered any change or harm in the terms, conditions, or benefits of her employment. Her pay was not decreased, she was not demoted, and no one threatened disciplinary action because she was female. She was not subject to different or disadvantageous terms or procedures in her employment. She was terminated—that much is clear—but only at the conclusion of the discrimination she alleges occurred. And, more to the point, Buck does not even allege that her termination was the adverse action.

Rather, Buck argues that Penney's patronizing, condescending behavior was a "continuing course of conduct" that constitutes an adverse employment action. *See* Dkt. 1 ¶ 90. But Buck has not described how this "course of conduct" affected any term or condition or benefit of her employment; nor has she cited any authority indicating that a "course of conduct" constitutes an adverse employment action.

15

Buck points to a recent Supreme Court decision, *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024), to support her argument. *See* Dkt. 24 at 15 (citing *Muldrow*, 601 U.S. 346). But her analogy to *Muldrow* is inapposite.

In *Muldrow*, the Supreme Court examined what it means for an employer's conduct to adversely affect the "terms [or] conditions" of employment, specifically in the context of a plaintiff who was transferred to a different role or unit within the same company. *See* Muldrow, 601 U.S. at 350. The Court observed that the lower court had required Plaintiff-Muldrow to demonstrate that her transfer caused "a 'significant' employment disadvantage," while courts in other cases had used "similar standards in addressing Title VII suits arising from job transfers." *Id*. Justice Kagan, writing for the majority, found this heightened standard to be atextual and inappropriate. The Court held that a plaintiff must show "*some harm* from a forced transfer to prevail in a Title VII suit, [but] she need not show that the injury satisfies a significance test." *Id*. (emphasis added). In other words, a transfer has to actually "treat a person worse" in order to be an adverse action. *Id*. at 354. But otherwise, the magnitude of the harm is irrelevant. More importantly for our purposes, it was undisputed that when Plaintiff-Muldrow alleged she was transferred between units, that "transfer, as both parties agree, implicated 'terms' and 'conditions' of [her] employment." *Id*.

Justice Kavanaugh, concurring, reached the same conclusion but framed the reasoning differently. Justice Kavanaugh emphasized that "[t]he discrimination is harm." *Muldrow*, 601 U.S. at 364 (Kavanaugh, J., concurring). "The only question then is whether the relevant employment action changes the compensation, terms, conditions, or privileges of employment." *Id*. at 365. And he concluded that "[a] transfer does so." *Id*.

Thus, *Muldrow* should be read to "circumscribe[] the injuries that can give rise" to these types of suits, in the sense that a transfer that **benefits** a plaintiff could not be an adverse action.

16

But *Muldrow* did nothing to change the fact that a plaintiff still must show how an employer's action affects "an **identifiable** term or condition of employment." *Muldrow*, 601 U.S. at 355-54 (emphasis added).

Here, no formulation of *Muldrow* supports Buck's claims, because in any case Buck is still required to connect the discriminatory harm to "an identifiable term or condition of employment." Whereas in *Muldrow* the plaintiff alleged—and the parties did not dispute—that her transfer from one department to another was a change in the terms or conditions of her employment, Buck here only alleges that she was exposed to a "continuing course of conduct," which she perceived as discriminatory, but which otherwise did not alter the terms or conditions of her employment. Without more, Buck fails to allege an adverse action.

Indeed, if Buck's allegations regarding Penney's course of conduct—*i.e.,* his condescending communication style—were construed, without more, as affecting a "term [or] condition" of employment, then causes of action for disparate treatment discrimination and hostile work environment would merge. As the Fourth Circuit noted in a recent decision (which was unpublished but which represents the Court's only decision thus far to cite *Muldrow*), "hostile work environment claims must satisfy the 'severe or pervasive' requirement **precisely to distinguish harassment that 'alters the conditions of the victim's employment' from harassment that doesn't.**" *Hansley v. DeJoy*, 2024 WL 4947275, at *2 (4th Cir. Dec. 3, 2024) (emphasis added) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986) (cleaned up)). Thus, while disparate treatment plaintiffs, like Buck, need not allege "severe or pervasive [harm] to be actionable," they still must allege harm to "an identifiable term or condition of employment." *Id*. (quoting Muldrow, 601 U.S. at 355-54). Here, Buck fails this requirement.

   *2.  **Different Treatment Than Similarly Situated Colleagues***

Buck also fails to show that she was treated differently than her male colleagues, because the evidence overwhelmingly demonstrates that the alleged discrimination—Penney's condescension—was applied equally to men and women. At the very first meeting in which Buck raised her concerns about Penney, Niebur told her that Penney "overexplains stuff to *everyone* that he works with." Dkt. 24-1 at 22:1-5 (emphasis added). He told Buck point-blank that Penney "goes into way too much detail on many topics," even when speaking to his own engineers. *Id*. at 22:6-13. And far from Niebur using his own, unique impression of Penney to ward off Buck's concerns, several other employees, male and female, experienced the same "discrimination" in their interactions with Penney:

> [Penney] can speak to any person in a condescending way.
> I've heard him do that to male and female. He's definitely
> overexplained things to me a number of times, and . . . it can be
> insulting or rude. But he doesn't just say that to women. It's across
> the board. I think it's part of his innate personality. Dkt. 24-2
> (Forbes Dep.) 9:16-22.

> [Penney] overcommunicates. He says way too much when he could just
> say a shorter amount to get the job done…it drives me nuts personally. . .
> I tried to explain that, from my own experience, [Penney] does that with
> everyone; it wasn't just her. It was everyone in the plant. He doesn't
> care who you are. It's just how he is. Dkt. 24-5 (Collins Dep.)
> 6:13-22, 7:21-8:3.

> [Penney] is an engineer . . . . He does explain things thoroughly and
> sometimes can come across as overexplaining items, especially maybe
> if you're not . . . an engineer. Dkt. 24-3 (Secrist Dep.) 9:1-4.

Buck presents no evidence to suggests the contrary, *i.e.*, that she was uniquely subject to Penney's condescension as a woman. Nor did Forbes, one of the few other females at Modine, submit such evidence: Forbes testified that Penney spoke to everyone in a condescending way, and although she found it "insulting or rude," she did not think it had anything to do with gender. Dkt. 24-2 9:16-22.

Buck's "naked opinion" that Penney's conduct was discriminatory does not create a genuine dispute of material fact. *Goldberg v. B. Green and Co., Inc*., 836 F.2d 845, 848 (4th Cir. 1988). In reaching this conclusion, we are careful not to weigh credibility. Buck may subjectively believe that Penney was condescending to her. That much we can credit. But the record beyond Buck's subjective belief demonstrates that Penney's condescension was *objectively* ubiquitous. Penney's condescension, in other words, did not discriminate. Accordingly, Buck's discrimination claims must fail, and summary judgment will be granted on Counts I and III.

B. Buck's Retaliation Claims (Counts II, IV and V)

Buck alleges that Modine retaliated against her for opposing unlawful discrimination, in violation of Section 704(a) of Title VII and Virginia Code Ann. § 2.2-3905, and for reporting violations of state and federal law in violation of Va. Code Ann. 40.1-27.3. To support a prima facie case of retaliation under any of these statutes, Buck must show that: **(1)** she opposed a practice made unlawful under Title VII; **(2)** Modine took an adverse employment action against her; and **(3)** there was a causal link between the two events. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015).

If Buck establishes a prima facie case of retaliation, the burden of production shifts to Modine to articulate a legitimate nondiscriminatory or nonretaliatory justification for her termination. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). If Modine succeeds, Buck must demonstrate that the purported non-retaliatory reasons "were not its true reasons but were a pretext for discrimination." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

1. ***Buck Does Not State a Prima Facie Case of Retaliation***

19

Here, Buck alleges that she was terminated in retaliation for engaging in protected
activity when she complained to her supervisors about Penney's communication style. *See, e.g.*,
Dkt. 1 ¶¶97-101. There is no doubt that Buck's termination was an adverse action, satisfying the
second element, but Buck cannot satisfy the first and third elements. As to the first, Buck's
complaints do not qualify as "protected activity" because they were made *not* in service of
opposing unlawful discrimination but in service of opposing conduct o*utside the scope of Title
VII*. As to the third, Buck cannot demonstrate that she was terminated because she complained
of the alleged discrimination; instead, she was terminated due to legitimate concerns with her
behavior and leadership skills.

### a.  Protected Activity in Opposition to An Unlawful Practice

"Protected activities fall into two distinct categories: participation or opposition."
*Laughlin v. Met. Wash. Airports*, 149 F.3d 253, 259 (4th Cir. 1998) (citing 42 U.S.C. § 2000e-
3(a)). Participation activities are outlined in the statute and include making a charge, testifying,
assisting, or participating in any manner in an investigation, proceeding, or hearing under Title
VII. *Laughlin*, 149 F.3d at 259 (citing § 2000e-3(a)). Oppositional activities include "staging
informal protests and voicing one's opinions in order to bring attention to an employer's
discriminatory activities." *Id*.

However, "Title VII is not a general bad acts statute, . . . and it does not prohibit private
employers from retaliating against an employee based on her opposition to discriminatory
practices that are <u>outside the scope of Title VII</u>." *Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir.
2011) (emphasis added). Thus, a plaintiff's oppositional activity—such as an internal
complaint—constitutes protected activity "only if it was directed at 'an unlawful employment
practice' under Title VII." *Cosby v. S.C. Probation, Parole & Pardon Services*, 93 F.4th 707,
718 (4th Cir. 2024) (quoting § 2000e-3(a)). The term "unlawful employment practice" should be

20

interpreted broadly, "such that it encompasses 'not only employment actions actually unlawful under Title VII but also employment actions [the employee] reasonably believes to be unlawful.'" *Cosby*, 93 F.4th 707, 719 (4th Cir. 2024) (quoting *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015)). "But that broad interpretation is not without limits." *Id.* Ultimately, "[w]hether an employee reasonably believed that the employment action she opposed violated Title VII is an objective inquiry that turns on the particular facts of the case." *Cosby*, 93 F.4th at 719. Accordingly, a plaintiff must point to "specific evidence in the record from which a jury could infer that a reasonable person in the plaintiff's shoes would have 'believed that her complaints related to an ongoing Title VII violation.'" *Cosby*, 93 F.4th at 719 (quoting *McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 412 (4th Cir. 2022)).

In *Cosby*, for example, the Fourth Circuit affirmed dismissal of a plaintiff's retaliation claim for failure to engage in a protected activity, *i.e.*, failure to oppose a practice made unlawful by Title VII. The Court found that the plaintiff's internal complaint was "undisputedly facially neutral as to sex" because both male and female members were subject to the same treatment. *Cosby*, 93 F.4th at 720. Furthermore, an internal investigator determined, after meeting with the plaintiff and collecting her information, that her complaint did not implicate Title VII but rather stemmed from "poor communication" and "poor relationships" with her supervisors. *Cosby*, 93 F.4th at 720. The plaintiff put forward a "litigation affidavit" to support her retaliation claim, but because "the employee's belief that she was engaging in protected activity must be evaluated by reference to objective criteria," the plaintiff's self-serving evidence containing an "otherwise unsubstantiated statement concerning her subjective intent and belief [did] not fit the bill." *Cosby*, 93 F.4th at 720. Accordingly, the plaintiff provided "no basis to infer that [she] believed she was opposing unlawful discrimination," and the district court was correct to dismiss her retaliation claim at summary judgment. *Cosby*, 93 F.4th at 719.

21

Here, even with an expansive view of what constitutes oppositional conduct, Buck's complaints about Penney do not constitute opposition of an unlawful employment practice. While Buck may have harbored a *subjective* belief that she was suffering discrimination and that her complaints therefore opposed an unlawful practice, Buck provides no *objective* basis for the Court to conclude that she <u>reasonably</u> believed such was the case. Buck was told at every turn that Penney's condescension was not unique to her or unique to women. Neibur, the person to whom Buck directed her complaints, immediately informed Buck that the treatment she was experiencing was common among employees who interacted with Penney, male and female. And Niebur's impression of the situation is supported by the testimony of several other employees, while no witness or other form of evidence in the record contradicts it.

Similar to *Cosby*, Buck's complaints are revealed as "facially neutral as to sex" when viewed objectively, because both male and female employees at Modine were subject to the same treatment. Buck's complaints arise not from discrimination but from personality conflicts, "poor communication," and "poor relationships" with her supervisors and colleagues. *Cosby*, 93 F.4th at 720. While Buck maintains a "subjective intent and belief" that she opposed unlawful discrimination, this fails to "fit the bill," since she provides no basis for the Court to infer that her belief was reasonable in light of all the circumstances. *See McIver*, 42 F.4th at 411 ("[O]nly when an employee has an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress is the employee's [opposition] conduct protected."

Accordingly, Buck fails to demonstrate that she engaged in a protected activity.

     *b.  Causal Link Between Opposition and Termination*

Nor can Buck demonstrate that she was terminated _because_ she engaged in allegedly
protected activity, _i.e._, her complaints. To the contrary, the undisputed evidence shows that Buck
was discharged because she was unsuitable for employment at Modine due to her behavior.

Buck supplied Modine's management with good cause to fire her from the start. Amidst
an environment of change and instability at the company, Buck's approach was to "come in,
swing axes, [and] take no prisoners." Dkt. 24-2 at 39:1-12. She regularly behaved in a "blatantly
hostile" manner, _id_. at 39:14-17, and she demonstrated a "disregard for her leadership" that was
very concerning. Dkt. 24-1 at 40:1-4. She admitted that she used sarcasm and profanity at work
in an "average" amount, though she was an employee in a _management_ position. Dkt. 25 at
131:4-8; 110-111. Within months of her new career at Modine, Buck failing to live up to
"leadership behavior"—to the extent that other employees "thought it was a problem" and began
to express concerns to Neibur. Dkt. 24-1 at 40:21-22; 41:1-4.

All of this occurred before Buck had lodged her complaints about Penney. From there,
concerns with her behavior only deepened. In fact, one of the more "concerning" episodes—the
sanding incident—did not involve Penney at all. This incident arose entirely because Buck
erroneously thought Garletts had bypassed her authority in halting a dangerous activity, and
during the incident's two-day stretch, Buck offended at least two of her colleagues. One,
Garletts, went home crying, and another, Neibur, questioned not only Buck's leadership skills
(_i.e._, her disregard for the safety of employees) but also her suitability for employment on an
interpersonal level. It took only one follow-up meeting, the next day, for Buck to exacerbate the
situation, leading Niebur to conclude that Buck's behavior was "not going to work" and that he
would recommend to the board that she be terminated. He then contacted Modine's HR director,
Neumann, to start the process. _See_ Dkt. 24-1 at 34-35.

On these facts, no evidence supports Buck's claim that she was fired because she complained about Doug Penney. Buck's friction with Penney was an undercurrent to her experience at Modine, but Buck was ultimately fired because she was not a suitable employee. *See Armstrong v. Index J. Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (Title VII "was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.).

\*\*\*

Accordingly, Buck fails to state a prima facie case of retaliation.

\*\*\*

### 2. *Pretext*

Because Buck has not established a prima facie case of retaliation, our analysis is at an end, and no burden shifting occurs.

But even if we were to conclude that Buck succeeded in stating a prima facie case, Buck cannot disprove that Modine had a legitimate, non-pretextual and non-retaliatory reason for firing her. Nothing in the record supports an inference that Modine's termination of Buck on behavioral grounds was merely pretext for a retaliatory discharge. Buck's allegations of pretext create only "weak issue[s]" of fact regarding whether Modine's stated reasons for her termination were false, and abundant evidence exists to the contrary. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007) (stating that "judgment as a matter of law may be appropriate if a plaintiff created only a weak issue of fact as to whether the employer's reasons were untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred"). The record conclusively demonstrates that Buck's supervisors and co-workers, men and women alike, perceived her as sarcastic, insubordinate, and disruptive, and that Modine fired her with an itemized list of such reasons in hand.

24

Accordingly, because Buck has not put forth sufficient evidence to create a genuine issue of material fact that Modine retaliated against her, the Court will grant summary judgment on Counts II, IV, and V.

IV.    **Conclusion**

For the reasons set forth above, the Court will **GRANT** Modine's motion for summary judgment, **Dkt. 20**, in an accompanying order.

The Clerk of Court is directed to send this opinion to all counsel of record.

ENTERED this ⎯31st⎯ day of March 2025.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE